```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT CHARLESTON
```

UNITED STATES OF AMERICA

v.                              CRIMINAL NO.   2:05-00149-001

MONICA LORRAINE AMAKER


### MEMORANDUM OPINION AND ORDER

On November 15, 2005, the court conducted an evidentiary hearing on defendant's motion to suppress any evidence or statements[1] obtained by law enforcement in the stop, frisk, search, and questioning of defendant which occurred on September 18, 2004.  After hearing the evidence and argument offered by the parties, the court denied the motion to suppress from the bench. In support of that ruling, the court makes the following findings of fact and conclusions of law.

### I.  Findings of Fact

On September 18, 2004, an officer with the Charleston Police Department, Danny L. Welch, was working in the Washington Street area of Charleston.  According to Officer Welch, Washington Street was an area known for having a high level of criminal activity, including illegal drug use and prostitution.  Officer Welch himself had made a number of drug arrests in that area and he knew there was an ongoing federal investigation into drug

---

[1] The United States indicated that it did not intend to use any statements of the defendant in its case-in chief.

activity in that area.  Officer Welch and his partner, Patrolman David Workman, were in plain clothes and an unmarked vehicle.

During his surveillance of Washington Street, Officer Welch observed a man standing between the back of two buildings counting money.  Based on his experience, Officer Welch felt that this indicated a drug deal was about to be made or had just been made.  Officer Welch informed Patrolman Workman of what he had seen and Workman stopped the car.  Officer Welch confronted the man, identified himself as the police, and showed him his badge. As Officer Welch was speaking with the man, later identified as Clarence Adams, and patting him down for weapons, a female, defendant herein, came out from behind the building and began running away from Officer Welch.  Upon searching Adams, police discovered $90 and a crack pipe.

Patrolman Workman testified that he and Officer Welch were patrolling the Washington Street area on September 18, 2004, when Welch informed him that he saw a man counting money in a gangway between two buildings.  Patrolman Workman testified that the subject area was a high crime area and that, in his seven plus years as an officer, he had made numerous arrests in the area.[2] Based on Officer Welch's account of what he had seen, Patrolman Workman felt that a drug transaction had just taken place or was about to take place.  Patrolman Workman then radioed Detective

---

[2] Patrolman Workman testified that he also knew there was an ongoing federal investigation into drug activity in that area.

Randle and Detective Wilson, two officers also working the Washington Street area.

As Patrolman Workman and Officer Welch approached Adams, they identified themselves as police officers and Workman saw defendant behind an air conditioning unit.  Patrolman Workman testified that defendant was laughing and, upon seeing him, said "Oh shit" and began running away from him.  Patrolman Workman testified that based on his experience as an officer, that defendant began running because she knew they were the police and that she had committed a criminal act.  Patrolman Workman ran after defendant and radioed Detectives Randle and Wilson.  He stopped pursuing defendant when he saw Randle and Wilson fall in behind her.

Detective Errol Randle, an officer with the Charleston Police Department of 12 years, testified that the Washington Street area was a high crime area and that he had made several arrests for narcotics and prostitution in the area.  Detective Randle further testified that he had been involved in a federal drug investigation in that area, prior to September 18, 2004. According to Detective Randle, Patrolman Workman radioed Randle and his partner to inform them that he and Officer Welch were going to approach someone from the front of the buildings and Detectives Randle and Wilson decided to approach the subject buildings from the rear.  As Detective Randle approached Washington Street, he heard someone laughing and observed

defendant running.  Patrolman Workman radioed Detectives Randle and Wilson to inform them that defendant was running.

Detective Randle began chasing defendant, identified himself as the police, and told her to stop.  Detective Randle testified that based upon his experience as a police officer, as well as the circumstances involved, that he suspected that defendant had been involved in criminal activity and was running to avoid being apprehended.  Once Detectives Randle and Wilson caught up with defendant, Detective Randle shoved her down.  As the detectives were trying to get defendant to put her hands behind her back, Detective Randle observed her left hand moving across her body towards her right pants pocket.  When defendant refused commands to put her hands behind her back, Detective Randle placed his foot on her head and she was handcuffed.

Defendant had a purse wrapped on her arm and the detectives took off defendant's handcuffs to remove the purse from her person.  Defendant was handcuffed again, Detective Wilson took possession of the purse, and Detective Randle patted defendant down for officer safety.  In so doing, he discovered a handgun in her right front pants pocket.  Detective Randle informed defendant she was under arrest.

Detective Stanley Wilson testified that the Washington Street area where defendant was arrested was known as a high crime area, in particular for prostitution and drugs.  He further testified that based upon radio instructions from Workman and Welch that he and Detective Randle began chasing defendant.

4

Detective Wilson testified that as he was trying to handcuff defendant, her left arm was reaching across her body toward her right front pants pocket.  Upon handcuffing her, Detective Randle showed Detective Wilson the gun located in defendant's right front pants pocket.

Detective Wilson testified that defendant had a purse on her arm and that, in order to remove the purse, he had to remove her handcuffs and throw the purse to the ground.  Once the purse was removed from defendant's person, she was handcuffed again.  Detective Wilson testified that the purse was open and as he picked it up from the ground, he observed what appeared to be crack cocaine inside it.  He further testified that he smelled marijuana.  Detective Wilson stated that he did nothing to open the purse.  Detective Wilson testified that he and Detective Randle took defendant back to their car where he removed the contents of her purse.  It contained large quantities of cocaine base, cocaine, morphine, and marijuana.

The court found the testimony of all four officers to be entirely credible.

## II.  Conclusions of Law and Analysis

The defendant bears the burden of demonstrating a Fourth Amendment violation, <u>Rakas v. Illinois</u>, 439 U.S. 128, 130 n.1 (1978), and, on appeal, the court reviews the evidence in the light most favorable to the party prevailing below. <u>United States v. Seidman</u>, 156 F.3d 542, 547 (4th Cir. 1998).  The factual findings underlying a motion to suppress, including

5

credibility determinations, are reviewed for clear error, while the legal determinations are reviewed de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995); United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, 506 U.S. 926 (1992).

In Terry v. Ohio, 392 U.S. 1, 30 (1968), the Supreme Court held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). According to the Court,

> While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an "inchoate and unparticularized suspicion or `hunch'" of criminal activity.

Id. at 123-24 (internal citations omitted). In determining whether reasonable suspicion exists, a court must consider the totality of the circumstances. U.S. v. Smith, 396 F.3d 579, 583 (4th Cir. 2005).

In Wardlow, two police officers were patrolling a high crime area to investigate illegal drug activity. Wardlow, 528 U.S. at 121. An officer observed Wardlow holding an opaque bag. See id. at 121-22. Wardlow looked in the officers' direction and fled. See id. at 122. The officers pursued Wardlow and detained him. See id. As they patted Wardlow down for officer safety, the

officers discovered a loaded handgun in his bag.  See id.  Wardlow moved to suppress the gun.  See id.

The Wardlow court held that a defendant's unprovoked flight from officers in an area known for heavy narcotics trafficking supported a reasonable suspicion that the defendant was involved in criminal activity and justified a stop of the defendant.  See id. at 124.  In so doing, the Court stated that

> officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.  Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis.

Id. (internal citations omitted).  The Wardlow court further noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and that unprovoked flight is "suggestive" of wrongdoing.  See id.[3]

The facts in Wardlow are strikingly similar to those in the instant case and, therefore, support denial of the suppression motion.  In support of their reasonable suspicion that criminal activity was afoot and that the stop of defendant was justified, the court relies upon: 1) the combined more than 30 years experience of the police officers involved; 2) the testimony of all four officers that the Washington Street area, where the stop

---

[3] The Court also noted that "unprovoked flight is simply not a mere refusal to cooperate.  Flight, by its very nature, is not `going about one's business'; in fact, it is just the opposite.  Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."  Id. at 125.

of defendant occurred, was a "high crime" area; 3) the officers' knowledge of an ongoing federal investigation in illegal drug activity in that area; 4)the testimony of all four officers that they had made arrests in that area on prior occasions; 5) defendant's unprovoked flight from the officers; 6) defendant's use of an expletive when she saw Patrolman Workman; and 7) the observation of Mr. Adams counting money in an area know for illegal drug use.  Viewing the totality of the circumstances, the court believes that the officers' stop of defendant was justified.

As to defendant's argument regarding the search of the purse, there is simply no evidence in the record to support suppression.  First, both Detective Randle and Detective Wilson testified that the purse was searched incident to arrest.  "A lawful custodial arrest justifie[s] a contemporaneous search without a warrant of the person arrested and the immediately surrounding area."  U.S. v. Silva, 745 F.2d 840, 847 (4th Cir. 1984).  In Silva, the court found that defendant's arrest justified a search of a zippered bag found in the motel room with the defendant, a bag which, due to its weight, an agent believed might have weapons in it.  See id.

In the instant case, the detectives had already uncovered one gun on defendant's person and, in the interest of officer safety, a search of the purse was entirely reasonable.  See Chimel v. California, 395 U.S. 752, 763 (1969) ("There is ample justification, therefore, for a search of the arrestee's person

8

and the area `within his immediate control' - - construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.").

Second, despite defense counsel's suggestion to the contrary, the only evidence in the record suggests that the purse was open at all times and, therefore, its contents were in plain view.  "If a valid search is in progress and the seizure of an item in plain view does not convert the search into a general or exploratory one, i.e., the discovery of the evidence was <u>inadvertent</u> then the `plain view' doctrine applies."  <u>U.S. v. Poms</u>, 484 F.2d 919, 922 (4th Cir. 1973) (internal citations omitted).  In <u>Poms</u>, the court found that there was no evidence an officer engaged in a general or exploratory search when he testified that:

> I then grabbed the bag and asked Mr. Poms for the bag, which he assisted.  I removed it from his shoulder and I then placed the bag on the floor, opened the bag the rest of the way, and I observed a Walther PPK/S .38 caliber automatic in the purse.  I further observed a clear plastic bag which contained a white crystal.  This packet was tied.

<u>Id.</u>  The <u>Poms</u> court denied the suppression motion, concluding that "[w]hile engaged in a valid protective search, an agent inadvertently observed the cocaine.  The `plain view' doctrine applies, and that contraband evidence could properly be seized and used as evidence against Poms at trial."  <u>Id.</u>

In the case at bar, Officer Wilson testified that he did nothing to open the purse and that the crack cocaine was visible as he reached down to retrieve the purse from the ground.  He

further testified that he smelled marijuana.  It is clear that the plain view doctrine applies and, as to this ground, the suppression motion must likewise be denied.

Based on the foregoing, the court DENIED defendant's motion to suppress.

The Clerk is directed to FAX and mail a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

IT IS SO ORDERED this 12th day of December, 2005.

ENTER:

*David A. Faber*

David A. Faber
Chief Judge